# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 15, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0046-MR

ROGERRICK MILLER                                                       APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 20-CR-001291

COMMONWEALTH OF KENTUCKY                                               APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Rogerrick Miller (Miller) was convicted of first-degree assault and possession of a handgun by a convicted felon. He was sentenced to a total of twenty years, enhanced to thirty years due to his status as a second-degree persistent felony offender. He now appeals his convictions and sentence as a matter of right. *See* Ky. Const. § 110. Miller's sole assertions of error on appeal are that the trial court erred by ruling that a detective's testimony concerning Miller's historical cell-site location information (CSLI) was not expert opinion testimony and that the trial court also erred by denying Miller's motion for a *Daubert*[1] hearing prior to ruling on the admissibility of the detective's testimony. After review, we affirm.

---

[1] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## I.  FACTS AND PROCEDURAL BACKGROUND

On June 11, 2020, at 3:50 am Miller called a taxicab company operating in Louisville and requested to be picked up at his home.  All calls for service are recorded by the cab company.  During Miller's call he identified himself as "Tay" and stated that his address was 1708 Valley Forge Way, a multiunit apartment building.  The victim in this case, Kahtry Abdallahi (Abdallahi), responded to the call.  At 4:28 am, Abdallahi's personal cellphone called Miller's cellphone, presumably to inform Miller of his arrival.

A short time later, the cab reached Miller's destination: the area of Muhammad Ali Boulevard and South 10th Street in downtown Louisville.  A video recording from inside the cab depicted Miller and Abdallahi arguing over the $13.70 cab fare; Abdallahi did not have change for the twenty-dollar bill with which Miller intended to pay.  After the brief argument, Miller exited the cab and began walking away from it, not realizing he left his cellphone in the back seat.  Abdallahi then drove down the street a short distance.  During that time, he noticed Miller's cellphone in the backseat, grabbed it, and put it in the front seat with him.  The cab then stopped, and Miller walked up to the driver's side window and said, "my phone is in there."  The pair then started arguing over the cab fare again and Miller said, "I'll smoke you."  Miller then shot Abdallahi twice in the neck.  The 911 call to the Louisville Metro Police Department (LMPD) in response to the shooting came in at 4:53 am.  Two shell casings found at the scene by LMPD were taken into evidence.

During his investigation, LMPD Detective Kevin Carrillo (Det. Carrillo) contacted the cab company to determine who Abdallahi's last customer had been and to review the video footage captured in the cab. Det. Carrillo then obtained a search warrant for the phone number that had requested the ride (502-450-1366) and learned that the number was registered to Miller. Det. Carrillo also reviewed LMPD records to determine if any recent calls for service had been made to Miller's apartment at 1708 Valley Forge Way. Four months earlier in February 2020 LMPD had responded to the home for an unrelated incident and spoke with Miller who was a witness. During that interaction, Miller identified himself as "Tay" but provided the officers with his social security number, and the officers determined it belonged to "Rogerrick Miller."

Based on the foregoing information, Det. Carrillo obtained an arrest warrant for Miller and a search warrant for the apartment at 1708 Valley Forge Way. When LMPD served the warrants, two individuals answered the door and exited the home without incident. The officers then cleared the home and discovered Miller hiding under a pile of clutter in a bedroom closet. Miller's cellphone and a gun were found in the bedroom in which Miller was discovered and were taken into evidence. After Miller's arrest, Det. Carrillo conducted a recorded interview with Miller at the police station. During that interview, Miller acknowledged that he went by "Tay," that his phone number was 502-450-1366, and that his address was 1708 Valley Forge Way.

A Kentucky State Police forensic firearm and toolmark examiner test fired bullets from the gun found in Miller's bedroom and visually compared them to

3

the shell casings found at the scene of the shooting. He testified that the spent shells found at the scene were fired from the gun found in Miller's bedroom.

Tragically, while Abdallahi did not die from his injuries, he was immediately rendered a quadriplegic. For several months after the shooting he was alert and able to communicate, but he eventually suffered cardiac-pulmonary arrest which deprived his brain of oxygen and left him in a vegetative state. At trial, a treating physician at Abdallahi's long-term care facility stated his prognosis was grim and that there was no expectation that he would recover. Apart from the injuries and complications arising from the shooting, Abdallahi was a healthy man in his early thirties.

Miller argued at trial that the individual captured in the footage from the cab was not him, and that the Commonwealth's mostly circumstantial evidence failed to prove he was the shooter beyond a reasonable doubt. He did not present any witness testimony or evidence.

Additional facts are discussed below as necessary.

## II.  ANALYSIS

Miller's assertions of error on appeal concern the testimony of LMPD Detective Timothy O'Daniel (Det. O'Daniel). Det. O'Daniel's testimony primarily concerned the historical CSLI associated with Miller's cellphone number on the night of the shooting.

At the time of the trial in this case, Det. O'Daniel was a detective with LMPD's digital forensics unit, but at the time of the shooting he was in a "de facto digital forensics unit" that provided support to LMPD's homicide unit. He

4

testified that he obtained Miller's certified cellphone records from his cellphone carrier, T-Mobile, pursuant to a search warrant. The responsive documents to that search warrant included Miller's historical CSLI information, i.e., information regarding which T-Mobile cellphone tower Miller's cellphone was utilizing when it made or received a particular phone call. Those documents also provided the location of each listed tower.

Det. O'Daniel prepared a PowerPoint presentation to aid his explanation of that data to the jury which was later entered into evidence. In it, he placed pins on Google Earth maps to demonstrate a particular tower's location. The first tower he discussed was located on Conn Street near the intersection of 7th Street and Berry Boulevard, approximately a half of a mile away from 1708 Valley Forge Way. According to T-Mobile's records, Miller's phone began communicating with that tower on June 11, 2020, at 3:50 am by making an outgoing call to the cab company's number. Then, between 3:51 am and 4:25 am, five different calls, both outgoing and incoming, were made between Miller's number and the cab company's number. As previously noted, at 4:28 am, Miller received a call from Abdallahi's personal cellphone number. Each of the foregoing calls utilized the same tower.

Then, at 4:49 am, Miller's phone began using a different tower located to the north of the first tower closer to the Ohio River and I-64 near the area where the shooting occurred. The call that Miller's phone received at 4:49 am was a missed call, and the Commonwealth posited in closing argument that the call came in after Miller had exited the cab, and that Abdallahi noticed the

5

phone in his backseat when that call came through. At 4:52 am, Miller's phone made an outgoing call still using the second tower.

Twice during Det. O'Daniel's testimony, once during direct examination and once during cross-examination, he made it clear that historical CSLI could not be used to pinpoint a cellphone's location. Rather, he testified that the only conclusion to be reached from that data is what tower a cellphone was utilizing when it made or received a call. In addition, he acknowledged that there are likely hundreds of cell towers in Jefferson County and that there is a certain amount of "overlap" between those towers. He further explained that it is possible for a phone to be physically closer to one tower but still be using a different tower further away, particularly in areas where there are several towers close together like downtown Louisville. He expounded that if there is a lot of "traffic" going into a particular tower in proximity to you, your phone may be redirected to a different tower further away.

Det. O'Daniel further briefly testified that he used a "drive test scanner" to confirm whether Miller's cellphone could have been communicating with the tower at issue if he were in the area of the shooting. He did this by driving through the incident location with the scanner in his vehicle. The drive test concluded it was possible that a cellphone on T-Mobile's network could have been utilizing the second tower if it was at the location of the shooting.

Miller objected to Det. O'Daniel's testimony just before he was called to testify at trial. Miller asserted that Det. O'Daniel needed to be qualified as an expert witness before he could provide the foregoing testimony and requested a

*Daubert* hearing. The Commonwealth responded by describing the testimony Det. O'Daniel would give and by arguing that the anticipated non-expert testimony was proper under *Torrence v. Commonwealth*, 603 S.W.3d 214 (Ky. 2020). The trial court ruled based on the Commonwealth's proffer that the testimony would not constitute an expert opinion and did not require a *Daubert* hearing.

Before this Court, both parties cite *Torrence* in favor of their respective positions: Miller asserts that Det. O'Daniel's testimony went beyond what is permitted under *Torrence* while the Commonwealth argues that the testimony in *Torrence* was essentially identical to Det. O'Daniel's testimony in this case and was therefore admissible. This Court reviews a trial court's ruling on the admissibility of evidence under the abuse of discretion standard. We therefore must uphold the trial court's ruling unless it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

In *Torrence*, this Court held that a trial court did not abuse its discretion by "permitting [a] detective to testify as a lay witness and mark coordinates on a map based on cell tower historical data reports." 603 S.W.3d at 229. Torrence was tried for shooting Garrado Thomas on 26th street in Louisville, leaving him paralyzed below the waist. *Id.* at 217. When questioned by police, Torrence claimed he was in the Blue Lick area of Louisville approximately 11 miles away from the 26th street shooting location at the time it occurred. *Id.* A detective attempted to verify this by serving a search warrant on AT&T for

Torrence's historical CSLI from the day of the shooting. *Id.* As in the case now before us, the records AT&T sent in response provided both the tower being communicated with during a given call and that tower's location. *Id.* Using those records and Google Maps, the detective concluded that Torrence's phone was utilizing towers close to the shooting location and was not communicating with towers near the Blue Lick area. *Id.* at 218.

At trial, the detective used a computer to open Google Maps on a video display for the jury. *Id.* at 224. He then "entered the location of the shooting on 26th Street, the Blue Lick area where Torrence claimed he was at the time of the shooting, and the location of the two cell towers to which Torrence's phone connected around the time of the shooting based on the AT&T report." *Id.* He demonstrated that the distance between the two towers and the shooting location was 1.131 miles for the first tower and 3,292 feet for the second tower, and no towers in the Blue Lick area interacted with Torrence's phone at the time of the shooting. *Id.* The *Torrence* Court took special notice of the fact that the detective "did not give an opinion about Torrence's location based on the report or the map he created during the course of his investigation from the report data." *Id.*

On appeal to this Court, Torrence argued that the trial court erred by allowing the detective to testify about historical CSLI without first being qualified as an expert. *Id.* at 223. We disagreed and held that

> marking points on a graph—in [this case] a map—based on a cell phone report including latitude and longitude of cell towers, does not require an expert . . . so long as the testimony does not go

beyond simply marking coordinates on a map.  If the witness seeks to offer an opinion about inferences that may be drawn from that information, that witness must be presented as an expert witness under KRE 702 (for example, if a witness seeks to provide an opinion as to the location of the cell phone during the relevant time based on the plotted coordinates).

*Id.* at 228.  This Court noted that the ability to plot a point on a graph based on a set of provided graph points or coordinates—which is in essence what the detective did—is taught to elementary school children in Kentucky and we can therefore reasonably expect our jurors to understand that process without the assistance of expert testimony.  *Id.* at 226.  We noted support for this conclusion existed in both federal[2] and sister state[3] case law.  603 S.W.3d at 226-27.  Finally, the *Torrence* Court specified that the proper way for a defendant to challenge such evidence was to "cross examine the witness as to the reports and underlying data as well as contest the maps" and to "call expert witnesses that arrive at different conclusions based on the same data." *Id.* at 228.

Insofar as the historical CSLI testimony is concerned, the difference in the testimony at issue in *Torrence* and Det. O'Daniel's testimony here is

---

[2] *United States v. Evans*, 892 F. Supp. 2d 949, 953 (N.D. Ill. 2012) (holding that use of Google Maps to plot cell tower locations "does not require scientific, technical, or other specialized knowledge and that these exhibits are admissible through lay opinion testimony under Rule 701").

[3] *See, e.g., State v. Johnson*, 110 N.E.3d 800, 807 (Ohio Ct. App.), *appeal not allowed*, 104 N.E.3d 792 (Ohio 2018) (holding that testimony comparing phone records showing "location of cell towers 'hit' by Johnson's cell phone at the time of the murder occurred [within] the location of the crime scene" was lay witness testimony); *State v. Greer*, No. E2015-09922-CCA-R3-CD, 2017 WL 2233647 (Tenn. Crim. App. May 17, 2017; *State v. Hayes*, No. M2008-02689-CCA-R3-CD, 2010 WL 5344882 (Tenn. Crim. App. Dec. 23, 2010).

9

negligible. In *Torrence* the detective used CSLI records to plot the locations of the cell towers and the shooting location in real time for the jury on Google Maps. In this case, Det. O'Daniel plotted those points on Google Maps in advance of trial and placed the images of those maps containing the plotted points into a PowerPoint presentation. Importantly, as in *Torrence*, Det. O'Daniel did not give an opinion as to Miller's location at the time of the shooting based on that data. To illustrate, during cross-examination he testified:

> **Defense Counsel:** And I think we might be going back over previous territory, but what we were just shown up there, it doesn't show the particular location of the phone, just that it was reading off of that tower?
>
> **Det. O'Daniel:** Yes. Using historical records you could not say that a device is at a specific location at a specific time back in history.

Accordingly, we agree with the Commonwealth's assertion that Det. O'Daniel's testimony did not run afoul of *Torrence*.[4]

We likewise see no issue with Det. O'Daniel's "drive test" testimony. A drive test

> is a corroboration method used by officers to verify the connection ranges associated with a given tower. Rather than simply trusting information from a third-party's software program or database, officers sometimes travel to the locations at issue and attempt to

---

[4] Because there is published, dispositive Kentucky precedent on the issue of whether Det. O'Daniel needed to be first qualified as an expert before providing the historical CSLI evidence at issue in this case, we decline to address Miller's arguments under *United States v. Jones*, 3:21-CR-89-BJB, 2022 WL 17884450 (W.D. Ky. Dec. 23, 2022). Although we do note that in *Jones*, the Western District of Kentucky ruled that Det. O'Daniel qualified as an expert sufficient to give the same kind of CSLI testimony at issue in the case at bar.

10

connect to the relevant tower.  If they can, that supports their understanding of the tower's range.

*Jones*, 2022 WL 17884450, at *7 (citations omitted).  Det. O'Daniel very briefly testified that he conducted a drive test and it confirmed that an individual using T-Mobile's network while at the site of the shooting could have been utilizing the same tower listed in Miller's phone records.  He gave no opinion regarding whether that meant that Miller was actually at the scene of the shooting when it occurred.  We therefore hold that the trial court did not abuse its discretion by permitting the testimony.  As Det. O'Daniel did not need to be qualified as an expert before providing his testimony at trial, the trial court also did not abuse its discretion by denying Miller's motion for a *Daubert* hearing prior to allowing the same

Even assuming arguendo that Det. O'Daniel's testimony was admitted in error, we would be hard-pressed to hold that the error was not harmless.

> RCr[5] 9.24 requires us to disregard any error or defect in the proceeding that does not affect the substantial rights of the parties. The test for harmless error is whether there is any substantial possibility that the outcome of the case would have been different without the presence of that error.

*Thacker v. Commonwealth*, 194 S.W.3d 287, 291 (Ky. 2006) (citing *Commonwealth v. McIntosh*, 646 S.W.2d 43, 43 (Ky. 1983)).  Det. O'Daniel's historical CSLI testimony was not central to the Commonwealth's case.  The Commonwealth's evidence primarily focused on proving that Abdallahi's last customer had been the individual that shot him, and that Miller was that final

---

[5] Kentucky Rule of Criminal Procedure.

11

customer. This was proven by both the cab company's phone records and Miller's phone records which showed that a phone number registered to Miller had called the company for a pickup and provided identifying information that matched Miller's, including his nickname and home address. The recording of that call was played for the jury, as was the recording of Miller's interview with Det. Carrillo, and the Commonwealth argued that the voice heard in each of those recordings was substantially similar. There was also video footage of the shooting and what preceded it that the Commonwealth argued depicted Miller. And, shell casings taken from the scene of the shooting were "matched" with the gun found in Miller's bedroom. There is accordingly no basis for this Court to believe that there is a substantial possibility that the outcome of the trial would have been different absent Det. O'Daniel's testimony.

## III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Nickell, JJ., concur. Thompson, J., concurs in result only.

12

COUNSEL FOR APPELLANT:

William Ellis Sharp
Assistant Public Defender

Leo Gerard Smith
Chief Public Defender


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Melissa Ann Pile
Assistant Attorney General